FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: Apr 14 2023

KEVIN P. WEIMER , Clerk

By: s/Kari Butler
Deputy Clerk

(USAO GAN 6/10)  Search Warrant

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

In the Matter of the Search of

An Apple iPhone seized from Vernon Dean MANDIGO on March 17, 2023

**APPLICATION AND
AFFIDAVIT FOR
SEARCH WARRANT**
Case number: 4:23-MC-28

I, Corey J. Wright, depose and say under penalty of perjury:

I am a Task Force Officer of the Drug Enforcement Administration and have reason to believe that in the property described as:

An Apple iPhone seized from Vernon Dean MANDIGO on March 17, 2023, at 2459 Shorter Avenue, Rome, Georgia 30165,

in the Northern District of Georgia there is now concealed certain information and certain data, namely,

See Attachment A, which is attached hereto and incorporated herein by reference,

which constitutes evidence of a crime, concerning violations of Title 21, United States Code, Section(s) 841 and 846 and Title 18 , United States Code, Section(s) 922(g)(1) and 924(c). The facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT

Continued on attached sheet made a part hereof.

Sworn to me by telephone pursuant to Federal Rule of Criminal Procedure 4.1.

_Corey J Wright_
Signature of Affiant

Corey J. Wright

April 14, 2023
Date

Rome, Georgia
City and State

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

_Walter E. Johnson_
Signature of Judicial Officer

AUSA Calvin A. Leipold, III

## AFFIDAVIT FOR SEARCH WARRANT OF
## ELECTRONIC DEVICE

I, Corey J. Wright, hereby depose and state under penalty of perjury as follows:

## INTRODUCTION

1.      This affidavit is in support of an application for a search warrant for the following cell phone (hereinafter the **"SUBJECT DEVICE"**):

>       An Apple iPhone seized from Vernon Dean MANDIGO on March 17, 2023, at
>
>       2459 Shorter Avenue, Rome, Georgia 30165, which is currently stored at the
>
>       HIDTA Rome Post of Duty.

2.      In my training and experience, I know that the SUBJECT DEVICE has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT DEVICE first came into the possession of the DEA.

3.      The SUBJECT DEVICE is currently in the possession of the DEA at the HIDTA Rome Post of Duty and is photographed below:



4.      I seek authorization for a forensic examination/search of the SUBJECT DEVICE for the purpose of retrieving electronically stored data more particularly described in Attachment A.

5.      Based on my training and experience and the facts set forth in this affidavit, I believe that there is probable cause to believe that violations of Title 21, United States Code, Sections 841 and 846 have been committed, and that there is now stored in the SUBJECT DEVICE evidence of these crimes and that the SUBJECT DEVICE constitutes property intended for use or to be used in committing said crimes.

## **AGENT BACKGROUND**

6.      I am a Task Force Officer with the Drug Enforcement Administration (DEA), and have been since January of 2022. I am an investigative or law enforcement officer of the United

States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

7.      I have been a law enforcement officer since December of 2016. I am currently employed with the Floyd County Police Department and have been since August of 2016. I am currently assigned as a Task Force Officer with the DEA and have been since January of 2022. I am currently assigned to the Atlanta Division, Rome Post of Duty (RPOD).

8.      During my time as a law enforcement officer, I have received training in various aspects of the criminal justice field. This training ranges from basic investigative courses, motor vehicle law, to tactical operations such as SWAT operator levels I and II.

9.      Prior to and during my assignment with the DEA, I have participated in numerous search and seizure warrants pertaining to the seizure of contraband and evidence, including warrants resulting in the seizure of illegal drugs, drug paraphernalia, drug records, and proceeds of drug trafficking. I have debriefed numerous defendants, informants, and witnesses, who possessed personal knowledge regarding drug trafficking organizations. I also have become familiar with and utilized investigative techniques such as, without limitation, electronic and physical surveillance, general questioning of witnesses, use of search warrants, use of informants, use of grand jury subpoenas, use of pen registers, and use of undercover agents.

10.      Based on my training and experience in the investigation of drug traffickers, and based upon interviews I have conducted with defendants, informants, and other witnesses and participants in drug trafficking activity, I am familiar with the ways in which drug traffickers

conduct their business. My familiarity includes the various means and methods by which drug traffickers import and distribute drugs; their use of cellular telephones to facilitate drug activity; and their use of numerical codes and code words to conduct drug transactions. I also am familiar with the ways that drug traffickers conceal, convert, transmit, and transport their drug proceeds, including, without limitation, the use of carriers to transport currency and proceeds, the use of third parties to purchase or hold title to assets, the use of off-shore accounts and the use of computer or smart phone applications for the transfer of virtual currency or crypto-currency.

11.     Based on my training and experience, I know that cellular phones are used by drug traffickers to discuss drug transactions with conspirators and customer, send photos and videos of drugs for sale, to store information on customer contacts, and used to launder drug proceeds.  Further, I know that cellular phones are also used to discuss the purchase of firearms, including privately made firearms.  Phones often contact communications regarding the purchase or sale of firearms, geolocation information that can reveal where transactions for drugs or gun occurred, and information about the purchase of firearms, including firearm components that are purchased off of the internet.

12.     I also know from my training and experience that individuals smuggle and/or transport illegal controlled substances using vehicles. These individuals evade law enforcement by conducting counter-surveillance maneuvers known as surveillance detection runs, or more commonly known as "heat runs."  These maneuvers commonly consist of constant route changes, lane changes, U-turns, and making frequent stops at commercial retail stores among other maneuvers designed to make mobile vehicle surveillance more difficult and dangerous to law enforcement personnel. Often, drug traffickers will reside in one location and store, or

4

"stash," drug supplies in another. While traveling to stash locations, traffickers will often use privately owned vehicles. While traveling to and from stash locations, traffickers will often conduct the maneuvers described above and will take illogical routes from one location to another in an attempt to evade or confuse law enforcement surveillance efforts. In addition, I have consulted extensively with other experienced agents regarding drug trafficking activities. As a result, the knowledge that I have obtained during my law enforcement career has been further informed by other law enforcement agents with experience conducting drug investigations.

13.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## SOURCES OF INFORMATION CONTAINED HEREIN

14.     I make this affidavit based upon personal knowledge derived from the following: personal participation in this investigation; information I have learned from discussions with Special Agents and Task Force Officers of DEA, Rome/Floyd Metro Task Force, Floyd County Police Department, Rome Police Department, and other law enforcement officers; and review of written reports.

15.     I have endeavored to make clear which facts stated in this affidavit are based upon my own personal observations and which are not. Unless otherwise noted, factual statements not based upon my personal observations are based upon information received from one or more other law enforcement officers who may have either direct or hearsay knowledge of the factual statement, such knowledge having been conveyed to me either personally or through a report that

I have reviewed. Wherever in this affidavit I state my belief, such belief is based upon my training and experience and upon the information obtained through this investigation.

16.    Because I am submitting this Affidavit for the limited purpose of demonstrating probable cause for the requested warrant, I have not included each and every fact known about this investigation.

## **PROBABLE CAUSE**

17.    On January 26, 2023, the HIDTA Rome Post of Duty and the Rome/Floyd Metro Task Force began surveillance operations with the intent to disrupt and dismantle the open-air drug market operating in the area of South Rome. This effort was made utilizing resources such as physical surveillance by agents along with video footage from pole cameras installed in the areas of Wilson Avenue and Hardy Avenue. Both locations are located in Rome, Georgia 30161, Floyd County which is in the Northern District of Georgia. Since the beginning of this investigation there have been several enforcement actions resulting in multiple arrests and seizures to include narcotics, firearms, and large amounts of U.S. currency.

18.    On March 17, 2023 at approximately 4:14 P.M., agents with the DEA HIDTA (High Intensity Drug Trafficking Area) Rome Post of Duty were performing surveillance of Wilson Ave and observed a white Audi Q7, bearing Georgia license plate CIM1806 registered to EAN Holding LLC (Enterprise Rental Cars), arrived and parked in front of 417 Wilson Ave, Rome, Georgia 30161. A black male, later identified as Vernon Dean MANDIGO, exited the rear passenger side door of the Audi and retrieved an unknown item from inside the vehicle that he placed inside the waist band of his pants before covering it with his sweater. At the same time, a black male identified as Devon Tremayne CARTER was observed walking from 418 Wilson

6

Ave in the direction of 417 Wilson Ave. As CARTER walked by MANDIGO, CARTER motioned for him with his hand and MANDIGO went to the rear of the Audi where he retrieved a large brown duffle bag. After retrieving the duffle bag, MANDIGO closed the rear hatch to the vehicle and walked with CARTER to 417 Wilson Ave apartment B and entered the residence with CARTER. While MANDIGO and CARTER were inside the residence, the driver of the vehicle, later identified as Antwan SERCHION, remained inside the vehicle. At approximately 4:37 P.M., MANDIGO was observed exiting 417 Wilson Ave apartment B carrying the duffle bag and walked to the Audi. MANDIGO placed the duffle bag in the rear passenger side door of the Audi and then entered the rear passenger side. After MANDIGO entered the vehicle, the vehicle left the area traveling on Wilson Ave toward Myrtle St.

19.    After the white Audi left the area of Wilson Ave, members of the surveillance team were able to locate the vehicle and mobile surveillance was initiated. The Audi was surveilled to the area of Pine Village Drive, Rome, Georgia 30165 and was observed parked in front of 47 Alpine Court, Rome, Georgia 30165.

20.    Once the Audi was discovered parked in front of the apartments on Alpine Court, agents initiated stationary surveillance of the Alpine Court and observed two subjects sitting inside the vehicle. A few moments later, a grey Nissan Altima bearing Georgia license plate SBX 9731 was observed turning onto Alpine Court and backing into a parking spot next to the Audi. Agents observed two subjects, later identified as Jamaican Ja Mal Malik MITCHELL (passenger) and Marcus Antawn TOWNSEND (driver), exit the vehicle and walk to 47 Alpine Court. At the same time, agents observed MANDIGO exit the Audi with a brown duffle bag and meet with TOWNSEND and MITCHELL in front of 47 Alpine Court before all three subjects entered the apartment and were out of view of agents.

21.     After several minutes all three subjects exited the apartment and agents observed a large duffle style bag being placed inside the trunk of the Altima and MANDIGO retuning to the Audi with the brown duffle bag. After MANDIGO entered the rear passenger side of the Audi, the Audi backed out of the parking spot and left the Alpine Court parking area traveling in the direction of Shorter Ave. A traffic stop was conducted on the Audi by Officers with the Rome Police Department on the parking lot of the Raceway convenience store located at 2549 Shorter Avenue, Rome, Georgia 30165 at approximately 4:53pm.

22.     Rome Police Officers approached the rear passenger side of the vehicle and knocked on the window to have the passenger roll down the window. As the window rolled down, officers smelled the odor of marijuana coming from the Audi and observed a black pistol and an extended magazine under the front passenger seat. The officer explained that he stopped the vehicle due to suspicion of the vehicle operating without valid insurance (O.C.G.A. 40-6-10) after a GCIC query returned the vehicle with an "unknown insurance" status. The driver, identified as Antwan SERCHION, stated the vehicle was a rental and that he had rental insurance. Upon the officer requesting identification from MANDIGO, he replied that he had none. The officer provided MANDIGO with a pen and notepad to write his name to which he portrayed his name to be "Randy Peterson." Officers had SERCHION and MANDIGO exit the vehicle at that time. A pat down revealed a Taurus 9mm (Serial: ABM267419) was discovered on SERCHION's person. The firearm was secured in an officer's vehicle for safety purposes. There was no firearm on MANDIGO's person. An officer told MANDIGO that the officer smelled the odor of marijuana, MANDIGO stated that he did not know anything about what was in the vehicle and was only getting a ride. MANDIGO was instructed to walk to another officer in order for a K9 to perform a free air sniff of the vehicle even though probable cause to search

8

the vehicle was already present due to the officer's detection of the odor of marijuana. The K9 was then deployed on the Audi to conduct the free air sniff of the vehicle. The K9 officer reported that the K9 performed a passive sit, which is indicative of the presence of narcotics. As the K9 was being utilized, SERCHION stated to an officer that he is a driver for Lyft and performs his work with rental vehicles. SERCHION asked the officer what provided the reason to search the vehicle. The officer explained to SERCHION that the odor or marijuana, to which SERCHION replied with the question of, "There is odor of marijuana in the car? From where?" SERCHION went on to advise the officer that he is a disabled veteran and that he smokes. A subsequent search of the Audi led to the discovery of a glass jar containing small baggies of marijuana. The glass jar was discovered in a backpack in the front passenger seat. One small baggy of marijuana was discovered between the driver seat and center console. A search of the rear of the vehicle led to the discovery of a large Louis Vuitton duffle style bag containing several large plastic bags of marijuana. The pistol previously observed by the other officer that was located at MANDIGO's feet was found to have no make, model, or serial number. The total weight of marijuana seized from the Audi was 5.71 lbs (2,591 grams).

23.     Officers placed MANDIGO and SERCHOIN under arrested. The SUBJECT DEVICE was seized from the person of MANDIGO.  Records checks were conducted on MANDIGO.  I learned that MANDIGO is a convicted felon, and was convicted of felon in possession of a firearm in the Northern District of California. He was sentenced to 21 months in custody on February 18, 2020.  He is currently on federal supervised release.  Further, MANDIGO had an active warrant for violations of his federal supervised release. The warrant was issued on January 27, 2022.  Based on the quantity of drugs seized, MANDIGO's criminal history, and the possession of the firearm, I believe that MANDIGO is engaged in an ongoing

drug conspiracy and that probable cause exists to search the phone from January 1, 2023 to the date of MANDIGO's arrest.

24.     Shortly after the Audi left the area, TOWNSEND and MITCHELL entered the Altima and left the parking area driving on a walking path between Alpine Court and Blankenship Place. The Altima drove to the back set of apartments on Blankenship Place and parked out of view of agents. Agents with the surveillance team arrived in the parking area where the Altima had driven to and observed TOWNSEND (driver) and MITCHELL (passenger) exit the vehicle and walk behind the apartment building.

25.     A few moments later, agents observed TOWNSEND and MITCHELL walking on Blankenship Place in the direction of Alpine Court. TOWNSEND and MITCHELL walked to a black Dodge Charger bearing Georgia license plate RIC3455 and left the apartment complex traveling in the direction of Shorter Ave. Agents followed the charger away from the apartment and observed the Charger make a right turn onto Coker Drive. The Charger then made a right turn into the Colonial Pines Apartments complex at 10 Coker Drive, Rome, Georgia 30165. The vehicle drove to the end of the parking area and pulled into a parking spot where a traffic stop was initiated by an officer with the Floyd County Police Department and agents with the Rome Post of Duty at approximately 5:35pm. Agents contacted the driver, Jamacian Ja Mal Malik MITHCELL, and passenger, Marcus Antawn TOWNSEND, and asked that the vehicle be turned off. As agents were about to make contact with MITCHELL, he opened the driver side door and began to exit the vehicle. When MITCHELL opened the door to the vehicle, Agents could smell a strong odor of marijuana coming from the vehicle. MITCHELL was escorted from the vehicle and detained by an officer with the Floyd County Police Department. The officer asked MITCHELL if he was in possession of anything illegal. MITCHELL admitted to the officer that

he was in possession of an amount of marijuana which he then handed to the officer. Agents

spoke with TOWNSEND at the rear of the vehicle briefly before detaining him and placing him

in handcuffs. Due to MITCHELL's admission of possessing marijuana, TOWNSEND was

searched and detained as well. Pursuant to searching TOWNSEND's person, agents discovered a

large amount of loose U.S. currency in TOWNSEND's left pants pocket. At this time, agents did

not collect the U.S. currency and secured both subjects inside the rear of the Floyd County Police

Officer's patrol vehicle. After both subjects were secured in the rear of the patrol car, agents read

both subjects their Miranda warning and both advised they understood and agreed to speak with

agents. While speaking with MITCHELL and TOWNSEND at the vehicle, agents asked if there

was anything else inside the vehicle, MITCHELL advised there was nothing else inside the

vehicle and gave consent for officers to search the vehicle. A subsequent search of the vehicle

confirmed there was no contraband in the vehicle.

26.     Shortly after contact was made with TOWNSEND and MITCHELL, agents

arrived at the Nissan Altima that had been parked and left at the apartment building on

Blankenship Place. Agents stood by with this vehicle until a search warrant was received for the

search of the vehicle. At approximately 7:32pm, a Floyd County state search warrant was

executed on the 2019 Nissan Altima bearing Georgia plate SBX9731 registered to Marcus

Antawn TOWNSEND. The vehicle was backed in at 82 Blankenship Place, Building E, in front

of apartment 2, Rome Georgia 30165. The Nissan was registered to TOWNSEND. Upon

completion of the search, $51,000 in U.S. currency was discovered in the trunk of the vehicle

inside a vacuum sealed bag and subsequently seized. In addition to the U.S. currency, a black

duffle bag containing multiple vacuum sealed bags containing marijuana were discovered and

11

seized. A Glock 22 handgun (Serial number: YV677US) was discovered in the center console and seized.

27.     Based on the totality of the circumstances to include the on-going investigation into the open-air drug market in the South Rome area, the delivery on Wilson Ave and Alpine Ct, the discovery of the large amounts of marijuana and U.S. currency, and his possession of the firearm without a serial number regardless of his felon status, I believe probable cause exists that evidence pertinent to this investigation and drug conspiracy resides in the memory of the Subject Device. It is probable that information residing in the memory of the Subject Device may lead to a source of supply as well as link other co-conspirators to this organization.

## **TECHNICAL TERMS**

28.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

13

d.   GPS:  A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and

presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

29.    Based on my training, experience, and research, I know that the Apple iPhone has capabilities that allow it to serve as a wireless communication device, digital camera, portable media player, GPS navigation device, and PDA**.** In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

31.    *Forensic evidence.* As further described in Attachment A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

15

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

32.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but

16

not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

33.     *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

34.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in the Subject Device.

## REQUEST FOR SEALING

35.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## <u>ATTACHMENT A</u>

1.    All records on the SUBJECT DEVICE from **January 1, 2023, to the March 24, 2023** that relate to violations of 21 U.S.C §§ 841(a) and 846, 18 U.S.C. § 922(g)(1) and 924(c) or are evidence of user attribution showing who used or owned the SUBJECT DEVICE, including but not limited to:

    a.  Contact information to include names, addresses, telephone numbers, email addresses, or other identifiers;

    b.  Call log information, including missed, incoming, and outgoing calls and any information associated with those numbers;

    c.  Any photographs, video and audio files that show the transportation, ordering, distribution, possession and sale of controlled substances, the collection, transmission, or other use of drug proceeds, the possession/use of firearms, and/or the connection to known and as yet unidentified co-conspirators that evidence the transportation, ordering, distribution, possession and sale of controlled substances, the collection, transmission, or other use of drug proceeds, and/or the connection to known and as yet unidentified co-conspirators;

    d.  Any text messages, email messages, chats, multimedia messages, messages through other installed applications or other electronic communications that evidence the transportation, ordering, distribution, possession and sale of

controlled substances, the collection of drug proceeds, the possession/use of firearms, and/or the connection to known and as yet unidentified co-conspirators;

e.   Any Global Positioning Satellite (GPS) entries, records of Internet Protocol Connections, and location entries to include cell tower and Wi-Fi entries;

f.   Any internet or browser entries or history;

g.   Any system, data or configuration information contained within the device;

h.   Lists of customers and related identifying information;

i.   Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

j.   Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

k.   Any information recording Vernon Dean MANDIGO's schedule or travel;

l.   All bank records, checks, credit card bills, account information, and other financial records.

m.   All of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2.      Evidence of user attribution showing who used or owned the Subject Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

For discovery and authentication purposes, DEA will maintain a forensic copy of searched devices.